In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00235-CR
______________________________


MARY ALVIS JOHNSON, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 102nd Judicial District Court
Bowie County, Texas
Trial Court No. 01-F-152-102


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Carter


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Â Â Mary Alvis Johnson was convicted by a jury of murdering her husband, Jerry Wayne
Johnson, and punishment was assessed at life imprisonment. She appeals the judgment


 alleging that
the evidence is legally and factually insufficient to support the conviction. We affirm the judgment
of the trial court.
Â Â Â Â Â Â Â Â Â Â Â Â Jerry Wayne Johnson, his wife, Mary Alvis Johnson, and his son, Jerry Wayne Johnson, II
(Jerry II), were at home together when Jerry was shot and killed. Mary has given several
explanations of what occurred. She told the first person to arrive at the scene, Gary Courtney, a
member of the volunteer fire department, that Jerry shot himself. Later, she told a deputy sheriff at
the scene that she did not know who shot him, but "they must have been waiting on him when he
came back in from outside." During the formal investigation, she gave three different statements to
Investigator Sherrie Pappas, wherein she alleged different factual scenarios leading to an accidental
shooting. Finally, at trial, she suggested that her son, Jerry II, killed his father and that she had been
protecting him by telling other versions of the occurrence. Jerry II testified that his mother told him
the shooting was an accident.
Â Â Â Â Â Â Â Â Â Â Â Â 1.Â Â Â Â Â Â Â Â Â Is the evidence legally sufficient to support a jury determination that Mary
Alvis Johnson committed murder?
Â Â Â Â Â Â Â Â Â Â Â Â In our review of the legal sufficiency of the evidence, we employ the standards set forth in
Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the court to view the relevant evidence
in the light most favorable to the verdict and determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d
1, 7 (Tex. Crim. App. 2000); Turner v. State, 805 S.W.2d 423, 427 (Tex. Crim. App. 1991). 
Â Â Â Â Â Â Â Â Â Â Â Â Mary was charged with murder by intentionally or knowingly causing the death of Jerry by
shooting him with a deadly weapon, a firearm, or by intentionally, with the intent to cause serious
bodily injury, committing an act clearly dangerous to human life, namely shooting him with a
firearm, which caused his death. 
Â Â Â Â Â Â Â Â Â Â Â Â It is undisputed that Jerry was killed by a .25 caliber handgun at his home on a night when
only he, his wife, and son were present. The scientific evidence is that the shot was fired from three
feet or further away from the deceased and no firearm residue was associated with the entrance
wound, all of which is incompatible with suicide. The handgun was fully functional and had a
trigger pull of seven and one-half to eight pounds. Immediately after the shooting, Mary told her son
that she obtained the gun at her husband's request and, when she sat down in the recliner by him, the
gun went off. She told Courtney that "Jerry has shot himself." Later that same morning, she told
Deputy Vic Thornburg she did not know how he got shot, but "they must have been waiting on him
when he came back in from outside." She told Deputy Thornburg that she had been firing a gun a
day or so earlier and inquired as to the length of time that gun residue would remain. Mary gave
three different statements to deputy Investigator Pappas, first saying that she heard a gunshot and
then found her husband shot. Second, Mary said she took the gun into the room because she thought
her husband had requested her to do so, and she put the gun by the loveseat arm by his head and then
saw a flash of light. She then told her son to call 9-1-1 because his father had accidentally shot
himself. Several days later, Mary made another statement to Investigator Pappas that her husband
told her to get the gun, and as she had the gun in her left hand and attempted to sit down, she fell and
the gun went off. At trial, Mary told a completely different version of that night's events. Before
the jury, Mary testified that Jerry II awakened her with the handgun in his possession and showed
her where the safety was located on the pistol, at which time she looked at him and said, "Son, what
do you want me to do? You want me to kill your daddy?" According to Mary, Jerry II then said,
"Now would be as good [sic] time as any." Mary then told her son, "I can't do this." She further
stated she took the gun into the front room where her husband was and put it on the floor. After
falling asleep in the chair, she was startled and saw her son pick up the gun and then saw a flash. 
Her son then said to her, "Go back to sleep. You're only dreaming," and tossed the gun to her. 
Â Â Â Â Â Â Â Â Â Â Â Â A few months before Jerry's death, Mary had a very unusual conversation. Thomas Joe
Blake, an acquaintance of Jerry and Mary, testified that, during one occasion when he was drinking
coffee with Jerry and Mary, and after Jerry went to the restroom, Mary stated to him, "[I]f Jerry died,
I would come into a bunch of money" and it would be worth $10,000.00 to her if he died. This
occurred two or three months before Jerry's death. Later, she again made the same comment to
Blake. Blake told Jerry that he needed to be "real careful." 
Â Â Â Â Â Â Â Â Â Â Â Â Mary also appeared to be urgently interested in Jerry's life insurance proceeds. Gena Marie
Bragg, an employee benefits specialist at Red River Army Depot, testified Jerry was an employee
there and had a life insurance benefit totaling $174,000.00. Three days after the death of her
husband, Mary came to Bragg's office and wanted to obtain the life insurance proceeds. She asked
Bragg to "write her a check" and became upset when the funds were not readily available.
Â Â Â Â Â Â Â Â Â Â Â Â It also appears that some attempt was made to have the scene appear as a suicide. Courtney
testified that, when he arrived after being told "Jerry has shot himself," he found the firearm
underneath the deceased's hand with the hand over the gun and the fingers over the trigger.
Â Â Â Â Â Â Â Â Â Â Â Â David Spence, the supervisor of the trace evidence unit at the Southwest Institute of Forensic
Science, testified he analyzed handwiping kits from Jerry, Mary, and Jerry II. In doing so, he was
looking for three elements: antimony, barium, and lead, which originate from the primer of a
cartridge case. All three people tested negative for gunshot residue, but there was an elevated level
of barium found on Mary's left palm. Further tests revealed that, when the weapon in question was
fired with the left hand, it did not deposit a sufficient quantity of the chemicals to determine
scientifically who shot the gun. 
Â Â Â Â Â Â Â Â Â Â Â Â The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight
to be given their testimony. See Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). The
jurors are also entitled to draw reasonable inferences from basic facts to ultimate facts. Kapuscinski
v. State, 878 S.W.2d 248, 249 (Tex. App.âSan Antonio 1994, pet. ref'd) (citing Dumas v. State, 812
S.W.2d 611, 615 (Tex. App.âDallas 1991, pet. ref'd)). The standard of review is the same in both
direct and circumstantial evidence cases. See Geesa v. State, 820 S.W.2d 154, 156 (Tex. Crim. App.
1991). Intent is a fact issue for the jury to resolve. Intent and knowledge can be inferred by the
conduct of, the remarks of, and the circumstances surrounding the acts engaged in by the accused. 
Ybarra v. State, 890 S.W.2d 98, 109 (Tex. App.âSan Antonio 1994, pet. ref'd); Parramore v. State,
853 S.W.2d 741, 745 (Tex. App.âCorpus Christi 1993, pet. ref'd). A culpable mental state
generally must be established by circumstantial evidence and may be inferred from the acts, words,
and conduct of the accused. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); 
Dues v. State, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.] 1982). 
Â Â Â Â Â Â Â Â Â Â Â Â In this case, Mary has given numerous accounts concerning the death of her husband. In at
least two of these statements, Mary admits being in possession of the firearm when it discharged. 
At one time, she was quoted as saying that he shot himself. When Courtney arrived, the gun
appeared to be positioned near the hand and fingers of the deceased. Suicide is contradicted by the
scientific evidence that the shot was fired more than three feet away from the deceased into the back
of his head, resulting in no firearm residue at the wound entrance. There is strong evidence Mary
had previously discussed killing her husband. One witness reports that she indicated his death would
result in a large financial gain for her and that it would be worth $10,000.00 to her if he died. She
attempted to claim the rather large life insurance proceeds within three days of his death and became
upset when that was impossible. While the handwiping tests could not positively identify her as
firing the shot, it did show residue of barium on her left palm. The fact that she reported the incident
in so many differing ways provided to the jury a major issue as to her credibility. 
Â Â Â Â Â Â Â Â Â Â Â Â The possibility of an accidental shooting is diminished, as laboratory testing revealed the
handgun in question required seven and one-half to eight pounds of pull on the trigger before it
would fire. After carefully reviewing the evidence in this case, we believe a rational trier of fact
could have reasonably concluded beyond a reasonable doubt that Jerry died as a result of a gunshot
wound intentionally and knowingly inflicted by Mary. 
Â Â Â Â Â Â Â Â Â Â Â Â 2.Â Â Â Â Â Â Â Â Â Is the evidence factually sufficient to support a jury determination that Mary
Alvis Johnson committed murder?

Â Â Â Â Â Â Â Â Â Â Â Â When reviewing a challenge to the factual sufficiency of the evidence to support the
conviction, we are required to determine whether, considering all the evidence in a neutral light, the
jury was rationally justified in finding guilt beyond a reasonable doubt. Zuniga v. State, No. 539-02,
2004 Tex. Crim. App. LEXIS 668, at *20 (Tex. Crim. App. Apr. 21, 2004). There are two ways in
which we may find the evidence to be factually insufficient. First, if the evidence supporting the
verdict, considered alone, is too weak to support the jury's finding of guilt beyond a reasonable
doubt, then we must find the evidence insufficient. Id. Second, ifâwhen we weigh the evidence
supporting and contravening the convictionâwe conclude that the contrary evidence is strong
enough that the State could not have met its burden of proof, we must find the evidence insufficient. 
Id. "Stated another way, evidence supporting guilt can 'outweigh' the contrary proof and still be
factually insufficient under a beyond-a-reasonable-doubt standard." Id. If the evidence is factually
insufficient, then we must reverse the judgment and remand for a new trial. Clewis v. State, 922
S.W.2d 126, 135 (Tex. Crim. App. 1996).
Â Â Â Â Â Â Â Â Â Â Â Â We have previously detailed the evidence supporting the conviction. Mary urges that
contravening evidence is that Jerry II committed the offense. There is evidence from Mary given at
trial indicating Jerry II shot his father. Of course, this evidence is directly contradicted by Mary's
many previous accounts of the events of that night, attributing her husband's death to suicide,
accident, or third persons, in addition to the contrary testimony of Jerry II. Mary urges that all her
other reports were given to protect her son.
Â Â Â Â Â Â Â Â Â Â Â Â Also, there was antagonism between Jerry II and his father. This home was not one
displaying a great deal of family unity and support. Jerry II had written some checks on his father's
account and pawned some personal property of his parents, which led to physical confrontations
between Jerry II and his father. At one time, the father had broken the son's nose.
Â Â Â Â Â Â Â Â Â Â Â Â Jerry II asked two persons how long gunpowder residue could be detected on a person's
hands. He also told his cousin that his mother was "going down for something that she didn't do." 
Â Â Â Â Â Â Â Â Â Â Â Â Finally, it is conceded that, if Mary is convicted, Jerry II will obtain the life insurance
proceeds.
Â Â Â Â Â Â Â Â Â Â Â Â Our role is to determine if Mary's conviction can stand in light of the contravening facts. Or
is this contravening evidence strong enough that the State could not have met its burden of proof?
Â Â Â Â Â Â Â Â Â Â Â Â Mary's own testimony presents conflicting evidence to which we are normally to defer to a
jury's determination. The jury chose not to believe her. In this instance, the jury had a solid rationale
for finding her testimony not to be credible, given her many contradictory statements.
Â Â Â Â Â Â Â Â Â Â Â Â While the antagonism between Jerry II and his father reached the physical confrontation level
at times, a jury was justified in concluding that this prior conduct never indicated that a threat of
death was involved.
Â Â Â Â Â Â Â Â Â Â Â Â The question of Jerry II concerning the length of time gunpowder residue would remain on
the hands is somewhat inculpatory. However, it is not of such magnitude as the much more
damaging evidence against Mary.
Â Â Â Â Â Â Â Â Â Â Â Â The statement of Jerry II to his cousin that his mother was "going down for something that
she didn't do" could be construed as his acceptance of her version of the eventsâthat he believed
the shooting was accidentalâas she reported to him and as he recounted on every occasion.
Â Â Â Â Â Â Â Â Â Â Â Â It is true that Jerry II will recover the life insurance benefits if his mother is convicted. 
However, to conclude Jerry II was motivated to kill his father by the allure of life insurance proceeds
requires a determination that Jerry II concocted and implemented a scheme not only to kill his father,
but also to assure that the legal system convicted his motherâwhich we believe a jury could find
to be a highly unlikely occurrence. In fact, Jerry II has never testified that his mother committed this
murder, but has repeatedly stated she told him it was an accident.
Â Â Â Â Â Â Â Â Â Â Â Â After considering all the evidence in a neutral light, we find a jury could have reasonably
concluded beyond a reasonable doubt that Mary was guilty of the murder of her husband.
Â Â Â Â Â Â Â Â Â Â Â Â We affirm the judgment of the trial court.
Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Jack Carter
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice
Â 
Date Submitted:Â Â Â Â Â Â Â Â Â Â July 15, 2004
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â August 12, 2004

Do Not Publish



raph;mso-element-anchor-horizontal:
 page;mso-element-left:246.8pt;mso-element-top:.8pt'>
 
 
 




Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

 In
The

   Court
of Appeals

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Sixth
Appellate District of Texas at Texarkana

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  No.
06-11-00126-CV

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  IN
RE:Â  SCOTT D. MARTIN

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Original
Mandamus Proceeding

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Before
Morriss, C.J., Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Opinion
by Justice Moseley

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  O P I N I O N

Â 

Â Â Â Â Â Â Â Â Â Â Â  Scott D. Martin
(Scott) seeks mandamus relief from this Court, arguing to us that the trial
court has erroneously refused to either abate or dismiss a suit in Gregg County
which Scott contends is inherently interrelated to a suit previously filed by
him in Harris County.Â  We deny
relief.Â  

Procedural History

Â Â Â Â Â Â Â Â Â Â Â  This application
for mandamus relief represents only one battle in the power struggle war
between Scott and his brother, Ruben Martin (Ruben), involving their familyÂs
company, Martin Resource Management Corporation (M.R.M.C.) and other related
persons.Â  See, e.g., In re Brown,
06-10-00108-CV, 2010 Tex. App. LEXIS 9421 (Tex. App.ÂTexarkana Nov. 30, 2010,
orig. proceeding) (mem. op.).[1]Â  M.R.M.C. was founded by the brothersÂ father,
shares of which were apparently issued to various family members or to trusts
for their benefit.Â  In September 2008,
Scott filed suit in Harris County against M.R.M.C., Ruben, and several other
individuals, wherein he alleged that Ruben and some of the other defendants
wrongfully issued shares in M.R.M.C. with the aim of increasing the holdings
and voting power of these parties, to the detriment of Scott and others.Â  That chapter in the war was followed in May
2010, when M.R.M.C. filed suit against Scott in Gregg County, claiming that
Scott had engaged in various conduct which interfered with M.R.M.C.Âs contract
to refinance existing indebtedness.Â  The
allegations were founded on ScottÂs act of filing the Harris County lawsuit and
upon allegations that Scott had committed slander by issuing disparaging
statements regarding M.R.M.C. and its management.Â  M.R.M.C. subsequently abandoned all causes of
action in that lawsuit except for a claim of a breach of fiduciary duty.Â  Part of the alleged breach of fiduciary duty
was ScottÂs filing of the Harris County lawsuit; M.R.M.C.Âs petition claimed
that the filing of the Harris County suit was prompted by an intention on
ScottÂs part to interfere with a specific business project which was being
pursued by M.R.M.C. at the time the suit was filed. 

Â Â Â Â Â Â Â Â Â Â Â  In the fall of
2010, Scott filed a plea in abatement in the Gregg County suit, seeking to have
that trial court abate its proceedings in favor of the proceeding in Harris
County.Â  The trial court denied that
plea, and we denied ScottÂs petition for writ of mandamus to compel the Gregg
County court to abate.Â  Id.Â 
In denying mandamus relief, we pointed out the record did not indicate
any interference by the Gregg County trial court on the actions of the Harris
County trial court; thus, we found the relators had
an adequate remedy by appeal.Â  

Â Â Â Â Â Â Â Â Â Â Â  In November 2011,
Scott re-urged his plea for abatement or dismissal to the trial court, which
denied the motion once again.Â  Scott now
seeks mandamus relief from this Court, claiming that the Gregg County trial
court has interfered with the Harris County courtÂs suit and requesting us to
mandamus the Gregg County court to abate its case.Â  Â Â Â Â Â Â Â Â Â Â Â  

Standard for Mandamus Relief

Â Â Â Â Â Â Â Â Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â  Mandamus is an
extraordinary remedy that issues only to correct a clear abuse of discretion or
violation of a duty imposed by law when no other adequate remedy by law is
available. Â In re Ford Motor Co., 988 S.W.2d 714, 725 (Tex. 1998) (orig.
proceeding) (citing State v. Walker,
679 S.W.2d 484, 485 (Tex. 1984)). Â ÂAbsent
extraordinary circumstances not present here, a denial of a motion to dismiss
or a plea in abatement is a ruling incident to the ordinary trial process which
will not be corrected by mandamus,
but by the legal remedy of the ordinary appellate process.Â Â Hooks v.
Fourth Court of Appeals, 808 S.W.2d 56, 59 (Tex. 1991) (orig. proceeding) (citing
Abor v. Black, 695 S.W.2d 564, 566Â67 (Tex.
1985) (ÂThis court has consistently held that it lacks jurisdiction to issue
writs of mandamus to supervise or correct incidental rulings of a trial judge when
there is an adequate remedy by appeal,Â including inter alia, pleas in
abatement.)).

The Present Case

Â Â Â Â Â Â Â Â Â Â Â  Scott has
presented this Court with nothing to show the matter in the Gregg County
lawsuit before the trial court is any different than it was a year ago.Â  

The two suits are related in that they both
involve MRMC and the two major shareholders, Scott and Ruben. Â But the basic dispute in the Harris County
case is that MRMC and Ruben improperly issued additional shares of stock in
MRMC, resulting in damage to Scott, whereas the Gregg County case alleges that
ScottÂs actions, including filing the Harris County suit and making disparaging
statements, interfered with MRMCÂs business relationship and damaged the
company.

Â 

Brown, 2010 Tex. App. LEXIS 9421, at **4Â5.Â  In the previous incarnation of this request
for mandamus, we went on to reiterate that even if controversies in two
separate legal actions are interwoven, mandamus was not the proper remedy where
the second suit did not Âinterfere with the exercise of jurisdiction to decide
the ultimate issues in the first suit.ÂÂ  Id. at *5 (citing Morris v. Legatt, 877 S.W.2d 899, 901
(Tex. App.ÂTexarkana 1994, orig. proceeding)).Â 
Scott directs us to the trial courtÂs issuance of a temporary injunction,
which enjoined Scott (or any party acting on his behalf) from taking any action
to prevent M.R.M.C.Âs prosecution of the Gregg County case, to prevent M.R.M.C.
from participating in the Gregg County trial, or interfering with the Gregg
County trial.Â  We point out the trial
courtÂs injunction cited ScottÂs attempts to have the Harris County court
enjoin M.R.M.C. from proceeding with the Gregg County case,[2] and
the Gregg County trial courtÂs specific finding that the Harris County trial
court did not have dominant jurisdiction over the issues pending in the Gregg
County trial court.[3]Â  

Â Â Â Â Â Â Â Â Â Â Â  We do not find
the trial courtÂs injunction against Scott amounted to interference on the part
of that trial court with the Harris County trial courtÂs proceedings.Â  

Â Â Â Â Â Â Â Â Â Â Â  We further do not
find the Gregg County trial court could have reached only one conclusion as to
the issue of whether the two suits are inherently interrelated.Â  See
Wyatt v. Shaw Plumbing Co., 760
S.W.2d 245, 247 (Tex. 1988) (plea in abatement in second-filed suit must be
granted where inherent interrelation exists between two cases; exact issues and
all parties need not be included in first action before second is filed if
claim in first suit can be amended to bring in all necessary and proper parties
and issues; rules of compulsory counterclaims and joinder
of parties to guide determination of presence of inherent interrelation).Â  Despite M.R.M.C.Âs having abandoned some of
its causes of action, its last-filed petition alleged several acts which
occurred subsequent to the filing of the Harris County suit as grounds for M.R.M.C.Âs
contention of breach of fiduciary duty.Â 
However, aside from his arguments that M.R.M.C.Âs cause of action was a
compulsory counterclaim,[4]
Scott offers nothing upon which he seeks relief but a conclusory
assertion the suits are inherently interrelated.Â  As we said in our 2010 opinion, the two cases
are related.Â  However, the interrelation
of the two lawsuits is not such that would mandate they be tried together; as
we also pointed out above, there are several allegations in M.R.M.C.Âs petition
which post-date the filing of the Harris County suit.Â  

No Compulsory Counterclaim

Â Â Â Â Â Â Â Â Â Â Â  Scott complains
of the trial courtÂs conclusion that M.R.M.C.Âs petition did not allege a
compulsory counterclaim against Scott.[5]Â  Based on the partiesÂ pleadings and the
record supplied us, we do not find the trial court erred in its
conclusion.Â  First, it has not been
demonstrated that M.R.M.C.Âs cause of action (alleging Scott breached his
fiduciary duty to M.R.M.C.) was mature at the time that M.R.M.C. filed its
answer to ScottÂs suit.Â  For example,
M.R.M.C. alleges several acts subsequent to ScottÂs suit which it alleges
amount to breaches of fiduciary duty, citingÂ 
several actions taken by Scott throughout 2009 and 2010.Â  While it is true that ScottÂs earlier-filed
suit in Harris County is part of M.R.M.C.Âs allegation, it is not the sole
basis of its claim.Â  Thus, we cannot say
with certainty that Scott has demonstrated the maturity of M.R.M.C.Âs claim at
the time it filed its response to the Harris County lawsuit.Â  

Â Â Â Â Â Â Â Â Â Â Â  Similarly, we
cannot conclude that M.R.M.C.Âs action arose solely out of the occurrence or
transaction which is the subject of ScottÂs suit.Â  Again, M.R.M.C.Âs suit alleged several other
instances of conduct on the part of Scott other than filing of the Harris
County lawsuit.Â  To the extent that the
two lawsuits are related, it has not been demonstrated that M.R.M.C.Âs suit
came out of the same events comprising ScottÂs claim for relief in the Harris
County lawsuit.

Â Â Â Â Â Â Â Â Â Â Â  In sum, the
record does not establish M.R.M.C.Âs action as a compulsory counterclaim to
ScottÂs suit; the trial court did not clearly err in rejecting ScottÂs
argument.Â  

Â Â Â Â Â Â Â Â Â Â Â  Having found the
two suits are not inherently interrelated, the Gregg County court has neither
acted to interfere with the jurisdiction or actions of the Harris County court,
nor isÂ  M.R.M.C.Âs cause of action a
compulsory counterclaim to ScottÂs suit.Â 
Accordingly, we find Scott has not shown himself entitled to the
requested relief.Â  See Cantu v. Longoria,
878 S.W.2d 131 (Tex. 1994) (per curiam) (orig.
proceeding); Walker v. Packer, 827
S.W.2d 833, 839Â40 (Tex. 1992) (orig. proceeding). Â 

Â Â Â Â Â Â Â Â Â Â Â  We deny his
petition.Â  

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Bailey
C. Moseley

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  January
12, 2012

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  January
12, 2012

Â 











[1]At
this writing, there are also two other pending appeals before this Court, Scott Martin v. Martin Resource Management
Corp., bearing this CourtÂs cause number 06-11-00125-CV; and another case
bearing the same style, numbered 06-10-00005-CV.Â  See
also Martin v. Martin, 326 S.W.3d 741 (Tex. App.ÂTexarkana 2010, pet. refÂd).





[2]The
Harris County court denied ScottÂs request for a temporary injunction. 

Â 





[3]The
trial courtÂs injunction is the subject of a separate appeal before this Court
in cause number 06-11-00125-CV.Â  





[4]Which
is not itself determinative of an inherent interrelation between suits.Â  See
Wyatt, 760 S.W.2d 245.Â  

Â 





[5]Â[A]
counterclaim is compulsory only if: Â (1)
it is within the jurisdiction of the court; (2) it is not at the time of filing
the answer the subject of a pending action; (3) the claim is mature and owned
by the defendant at the time of filing the answer; (4) it arose out of the same
transaction or occurrence that is the subject matter of the opposing partyÂs
claim; (5) it is against an opposing party in the same capacity; and (6) it
does not require the presence of third parties over whom the court cannot acquire
jurisdiction.ÂÂ  Ingersoll-Rand Co. v. Valero Energy Corp., 997 S.W.2d 203, 207
(Tex. 1999); see Tex. R. Civ. P. 97(a).